WILLIE M. GRAVES AND WIFE, BELVA W. GRAVES AND TERRY GRAVES
    HEATH v. WILLIAM L. WALSTON AND WIFE, PATTY L. WALSTON,
    GEORGE H. WALSTON AND WIFE, JEAN H. WALSTON

No. 95

(Filed 4 March 1981)

**1. Rules of Civil Procedure § 50.4— failure to move for directed verdict —
    judgment n.o.v. improper**

Plaintiffs had no standing after the verdict to move for judgment n.o.v.
where they did not move for directed verdict at the close of their evidence or at the
close of all the evidence. G.S. 1A-1, Rule 50(b)(1).

**2. Rules of Civil Procedure § 50— motion for judgment n.o.v. and new trial —
    failure to rule on new trial motion**

When a motion for judgment n.o.v. is joined with a motion for a new trial, it is
the duty of the trial court to rule on both motions.

Justices CARLTON and MEYER did not participate in the consideration or
decision of this case.

APPEAL by defendants from an unpublished decision of the
Court of Appeals, 46 N.C. App. 606, 275 S.E. 2d 570 (1980), uphold-
ing judgment for plaintiffs entered by *Smith (David I.), S.J.*, at the
31 May 1979 Session of GREENE Superior Court. This case was
docketed and argued as No. 110 at the Fall Term 1980.

At a pretrial conference, certain facts, drawn mostly from the
averments of the complaint and answer, were stipulated and pre-
sented to the jury at trial. Those facts may be summarized as
follows:

Harry L. Walston died intestate on 30 June 1950, leaving a
farm in Greene County which, under the laws of intestacy, passed to
his children, Belva Walston Graves, William Walston and George
Walston, as tenants in common, each inheriting a one-third undi-
vided interest in the farm subject to the dower interest of Esther T.
Walston, wife of the deceased.

Willie Graves rented the farm and tended it for more than ten
years for his wife, her brothers and her mother. The farm contained
a feeder pig operation which was the subject of a recorded contract
between Willie Graves and Bunting Swine Farms. In 1974, Willie
and Belva Graves mortgaged Belva's one-third undivided interest
to Branch Banking and Trust Company as a portion of the security

for an $85,000 loan by the bank. Willie and Belva Graves defaulted on the loan and the bank instituted foreclosure proceedings. A foreclosure sale was set for 15 November 1976. William and George Walston became concerned that part of the farm might be acquired by someone outside the family. The parties entered into an agreement whereby the interest of Belva Graves would not pass out of the family. According to a stipulated fact drawn from defendants' answer:

> [P]rior to the foreclosure sale the plaintiff, Belva W. Graves and her husband, Willie M. Graves, and the defendants agreed that if the Bunting brothers would put up the money necessary to bid in the one-third undivided interest in said lands at the foreclosure sale, then, and in that event, William L. Walston would make high bid for said lands at the foreclosure sale and, upon payment of said purchase price to the Trustee and after acquisition of title of said lands, deed said one-third undivided interest to Terry Graves Heath.

Willie Graves, defendants William and George Walston, and the Bunting brothers met at the courthouse on the morning of the sale and discussed the agreement. At the sale, the bank bid $9,000; William Walston then bid $10,000, and the sale was closed. The Bunting brothers gave a check for $1,000 to the trustee as a ten percent deposit. The check was never cashed. Neither the Buntings nor plaintiffs were called upon to provide the bid money. Defendants and Esther T. Walston, the widow with the dower interest, obtained a $10,000 loan from First Citizens Bank which was used to pay the amount of the bid to the trustee who conducted the foreclosure sale. The sale to William Walston was confirmed, and on 6 December 1976, the one-third undivided interest of Belva Graves was deeded to William L. and George Harper Walston.

William Walston then advised his sister that she and the other plaintiffs had no interest in the property and that he and George Walston owned the entire property subject to their mother's dower right. Defendants further advised plaintiffs and Bunting Swine Farms by registered mail that the farm belonged to defendants and that the feeder pig operation on the farm must be terminated unless Bunting Swine Farms and plaintiffs paid $2,000 rent by 15 February 1977 and recognized the ownership of the farm by defendants.

In addition to the above stipulated facts, there is evidence tending to show:

The Buntings agreed to put up the money for William Walston to bid in the farm. The principal concern of the Buntings was to see that the hog feeder operation upon which they relied in their business continued to function. Willie Graves was employed by them in their pig farm operations. It was felt that others might not bid on the farm if they knew family members were trying to buy it back. William Walston testified: "I was there for the sole purpose of bidding the farm in and having it in my name and when they paid off the rest of the money it was going to Terry Graves. I was not interested in where the money was coming from so long as the money came and it was put in Terry's name."

William Walston bid in the property and C. B. Bunting gave the trustee a deposit check for $1,000. After the sale, the Buntings discussed the $10,000 loan with their attorneys. The Buntings intended the hogs Willie Graves raised for them to be security for the loan. The Bunting attorneys suggested other alternatives including having title to the interest in the name of Bunting Farms with a "legal paper" acknowledging the loan and agreeing to convey the property to Terry Graves Heath on payment of the loan. The Buntings informed Willie Graves of their attorneys' advice. Douglas Bunting testified, "[w]e would consider putting title in the name of Terry Graves Heath if it had to go that way." Willie Graves told his brother-in-law William Walston of the Buntings' proposal that the property be in their name until the $10,000 purchase price was paid them. William Walston objected to this but did indicate a deed of trust to the Buntings by Terry Graves Heath would be acceptable.

The Walston brothers felt the Bunting brothers had reneged on the agreement. It was their intent to keep the farm in the family. It was impossible for their sister to hold the property because of her other judgment creditors who would seek execution on the land. The Walston brothers wanted their niece, Terry Graves Heath, to have her mother's interest. Terry Graves Heath testified that her uncle told her of the plan to put her mother's interest in her name and that she was not to worry about the cost as the rents would more than cover it. William Walston testified that "I would bid it in for Terry if the Bunting brothers would pay the money. I did bid it in for Terry upon the condition of the Bunting brothers putting up the money."

Graves v. Walston

The Bunting brothers testified that from the date of the foreclosure sale until the day of the trial, they were ready, willing and able to provide the $10,000 purchase price.

The Walston family farm contains seventy-six acres of land. Forty-four acres are cleared fields which bring an annual rent of $8,000. Eight to ten of these cleared acres are prime tobacco land. The tobacco poundage is about 20,000 pounds a year. The remaining acreage consists of woodlands and pasture which is used in the feeder pig operation which Willie and Belva Graves developed at a cost of $50,000 to $60,000. The farm has 1800 feet of paved road frontage. The fair market value of the farm was placed at between $150,000 and $200,000. William Walston testified the one-third interest of his sister for which he paid $10,000 was worth $25,000 to $30,000.

The case was submitted to the jury on five issues which were answered as follows:

1. Did the defendant, William L. Walston, agree at or before the sale on November 15, 1976 to take title in trust for Terry Graves Heath on the condition that the Bunting Brothers supply the purchase price?

ANSWER: YES.

2. Did the plaintiffs rely on this agreement and allow the land to be bid in by the defendant, William L. Walston?

ANSWER: YES.

3. If so, did the defendant William L. Walston bid in the property at a grossly inadequate price?

ANSWER: YES.

4. Were the plaintiffs at all times ready, willing, and able to comply with the agreement?

ANSWER: NO.

5. Did the defendant, William L. Walston, wrongfully put title to the land in the name of himself and his brother, George Walston?

ANSWER: NO.

Plaintiffs moved to set aside the answers to the fourth and fifth issues as contrary to the weight of the evidence and the law. Plaintiffs argued that the answers to the first three issues entitled them to this as a matter of law. They also moved for judgment notwithstanding the verdict and for a new trial. The trial judge then stated:

> Well, the Court is of the opinion that a directed verdict should have been entered for the plaintiffs before they returned a verdict back. The motion to set aside the verdict as to issues four and five, motions are denied and the Court concludes, however, that notwithstanding the answers to these issues, judgment is to be entered for the plaintiffs and orders the defendants to convey all of their right, title and interest to the property to Terry Graves Heath upon tender by the plaintiff of the purchase price of $10,000.00 either in U.S. currency or certified check.

A judgment to this effect was entered and defendants appealed to the Court of Appeals which affirmed the trial court's "equitable judgment" notwithstanding the verdict. This Court allowed defendants' petition for discretionary review pursuant to G.S. 7A-31.

*Braswell & Taylor by Roland C. Braswell, attorneys for plaintiff appellees.*

*James H. Toms attorney for defendant appellants.*

HUSKINS, Justice.

Did the trial court err by entering a judgment notwithstanding the verdict for plaintiffs when plaintiffs had not moved for a directed verdict at the close of all the evidence? The answer is yes.

The record on appeal as amended reveals that the following transpired after the jury verdict came in:

> COURT: All right, any motions.

> MR. BRASWELL: Your honor, I would like for the record to show, that the plaintiffs move that the answer to Issue number four be set aside for that the answer is contrary to the evidence, contrary to the law and that it should be set aside in the interest of justice. I make the same motion with reference to the fifth one and I would move the court that judgment be entered notwithstand-

ing the verdict for that the answers to the first three issues would entitle us to judgment notwithstanding the answer to the issues number four and number five and finally if the court does not so grant, then we move for a new trial.

COURT: Well, the Court is of the opinion that a Directed Verdict should have been entered for the plaintiffs before they returned a verdict back. The motion to set aside the verdict as to issues four and five, motions are denied and the Court concludes however that notwithstanding the answers to these issues, judgment is to be entered for the plaintiffs and orders the defendants to convey all of their right, title and interest to the property to Terry Graves Heath upon tender by the plaintiff of the purchase price of $10,000.00 either in U.S. currency or certified check.

As shown by the amended record, plaintiffs' counsel made three post verdict motions: (1) to set aside the answers to issues four and five, (2) for judgment notwithstanding the verdict and (3) for a new trial. The first motion was expressly denied. The second was granted. The third was never ruled on by the trial court.

A motion for judgment notwithstanding the verdict is governed by Rule 50(b)(1) of the North Carolina Rules of Civil Procedure which provides:

Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the submission of the action to the jury shall be deemed to be subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. In either case the motion shall be granted if it appears that the motion for directed verdict could properly have been granted. A motion for a new

trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the judge may allow the judgment to stand or may set aside the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the judge may direct the entry of judgment as if the requested verdict had been directed or may order a new trial. Not later than ten (10) days after entry of judgment or the discharge of the jury if a verdict was not returned, the judge on his own motion may, with or without further notice and hearing, grant, deny, or redeny a motion for directed verdict made at the close of all the evidence that was denied or for any reason was not granted.

The plain meaning of the quoted rule is that a motion for judgment notwithstanding the verdict must be preceded by a motion for directed verdict at the close of all the evidence. *Whitaker v. Earnhardt*, 289 N.C. 260, 221 S.E.2d 316 (1976). The reason for that requirement has been explained by Professor Moore as follows:

This is to avoid making a trap of the latter motion. At the time that a motion for directed verdict is permitted, it remains possible for the party against whom the motion is directed to cure the defects in proof that might otherwise preclude him from taking the case to the jury. A motion for judgment n.o.v., without prior notice of alleged deficiencies of proof, comes too late for the possibility of cure except by way of a complete new trial. The requirement of the motion for directed verdict is thus in keeping with the spirit of the rules to avoid tactical victories at the expense of substantive interests.

5A Moore's Federal Practice § 50.08 (1980); *see also* 9 Wright and Miller, Federal Practice and Procedure § 2537 (1971).

[1]    In the present case, plaintiffs did not move for directed verdict at the close of plaintiffs' evidence or at the close of all the evidence. Plaintiffs thus had no standing after the verdict to move for judgment notwithstanding the verdict and for that reason the trial court was without authority to enter judgment notwithstanding the verdict for plaintiffs. The Court of Appeals erred when it affirmed. The judgment notwithstanding the verdict for plaintiffs must there-

fore be vacated.

**[2]** The trial court did not rule on plaintiffs' third post verdict motion for a new trial. This was error. When a motion for judgment notwithstanding the verdict is joined with a motion for a new trial, it is the duty of the trial court to rule on both motions. Rule 50 (c) (1) provides:

> If the motion for judgment notwithstanding the verdict, provided for in section (b) of this rule, is granted, the court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate division has otherwise ordered. In case the motion for new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate division.

*See also Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940). The ruling on the alternative motion for a new trial becomes important where, as here, the judgment notwithstanding the verdict is overturned on appeal. Had the trial court conditionally denied the alternative motion, plaintiffs, as provided in Rule 50 (c) (1), could have excepted and appealed conditionally therefrom. Incident to such conditional appeal, plaintiffs, as appellees, could have included their exceptions in the record on appeal and could have set out cross assignments of error allegedly entitling them to a new trial in the event the judgment notwithstanding the verdict was reversed on appeal. *Hoots v. Calaway*, 282 N.C. 477, 193 S.E.2d 709 (1973). Had the trial court conditionally granted the alternative motion, the case could have proceeded to new trial upon remand following our reversal of the judgment notwithstanding the verdict, unless this Court on appeal also reversed the grant of a new trial. *Dickinson v. Pake*, 284 N.C. 576, 201 S.E.2d 897 (1974).

We note judicially that the special superior court judge who tried this case is no longer on the bench. It would be inappropriate for another superior court judge who did not try the case to now pass upon plaintiffs' alternative motion for a new trial. *Hoots v. Calaway, supra.*

We have reviewed the record and find error of law prejudicial to plaintiffs. Five issues were submitted to the jury and answered by it as follows:

> 1. Did the defendant, William L. Walston, agree at or before the sale on November 15, 1976 to take title in trust for Terry Graves Heath on the condition that the Bunting Brothers supply the purchase price?
>
> ANSWER: YES.
>
> 2. Did the plaintiffs rely on this agreement and allow the land to be bid in by the defendant, William L. Walston?
>
> ANSWER: YES.
>
> 3. If so, did the defendant William L. Walston bid in the property at a grossly inadequate price?
>
> ANSWER: YES.
>
> 4. Were the plaintiffs at all times ready, willing, and able to comply with the agreement?
>
> ANSWER: NO.
>
> 5. Did the defendant, William L. Walston, wrongfully put title to the land in the name of himself and his brother, George Walston?
>
> ANSWER: NO.

The answers to the first two issues, nothing else appearing, would entitle plaintiffs to judgment as a matter of law on the theory of a parol trust. In *Bryant v. Kelly*, 279 N.C. 123, 181 S.E.2d 438 (1971), we discussed at length the requirements for a parol trust. In *Bryant*, we said:

> North Carolina is one of a minority of states that has never adopted the Seventh Section of the English Stat-

ute of Frauds which requires all trusts in land to be manifested in writing. Even so, this Court has consistently enforced safeguards that considerably limit the application of the parol trust doctrine. Despite such limitations, this Court has always upheld parol trusts in land in the "A to B to hold in trust for C" situation. The rule is stated in *Paul v. Neece* [244 N.C. 565, 94 S.E.2d 596 (1956) ] in these words: "[I]t is uniformly held to be the law in this State that where one person buys land under a parol agreement to do so and to hold it for another until he repays the purchase money, the purchaser becomes a trustee for the party for whom he purchased the land, and equity will enforce such an agreement." Moreover, a parol trust "does not require a consideration to support it. If the declaration is made at or before the legal estate passes, it will be valid even if in favor of a mere volunteer." Evidence of the establishment of a parol trust is required to be clear, cogent, and convincing; a mere preponderance of the evidence is not sufficient.

279 N.C. at 129-30, 181 S.E.2d at 441-42 (citations omitted). The third issue, while not a prerequisite to establishment of a parol trust, demonstrates overwhelmingly that equity is on the side of the plaintiffs. If on remand another jury trial is required, the presiding judge shall formulate and submit appropriate issues based upon the pleadings and the evidence offered at that time.

In the present case, the parties stipulated and the jury found that William Walston agreed, at or before the foreclosure sale, to take title in trust for Terry Graves Heath on condition that the Bunting brothers supply the purchase price on behalf of plaintiffs. William Walston himself so testified. Terry Graves Heath and the other plaintiffs relied on that agreement, and William Walston was permitted to bid in the land for $10,000. This establishes a parol trust in favor of Terry Graves Heath. Although plaintiffs alleged in their pleadings a constructive or resulting trust, the pleadings, pursuant to Rule 15(b) of the Rules of Civil Procedure, are in effect deemed amended to conform to the proof. Even so, filing a formal written amendment to the complaint by leave of the trial court is envisioned by the rule.

A parol trust must be established by evidence clear, cogent

and convincing; a mere preponderance of the evidence is not sufficient. *Bryant v. Kelly, supra.* We note from the charge in this case that the judge merely required plaintiffs to prove their case by the greater weight of the evidence.

For the reasons stated, the decision of the Court of Appeals is reversed and the judgment for plaintiffs notwithstanding the verdict is vacated. The case is remanded to the trial court for a new trial in accord with this opinion.

Reversed and remanded.

Justices CARLTON and MEYER did not participate in the consideration or decision of this case.